IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| SHAWN STEWART, BRIAN DAMANN, and GRANT OILAR, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 12-05136-CV-SW-DGK |
| USA TANK SALES AND ERECTION COMPANY, INC., | ) ) ) ) | |
| Defendant. | ) | |

## ORDER DENYING APPROVAL OF PROPOSED CLASS SETTLEMENT

This case is a putative collective action alleging Defendant USA Tank Sales and Erection Company, Inc. ("USA Tank Sales") violated the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et. seq.*, and a putative class action alleging USA Tank Sales violated the Missouri Minimum Wage and Maximum Hour Law ("MMWMHL"), Rev. Stat. Mo. 290.500 *et. seq.* Name Plaintiffs Shawn Stewart ("Stewart"), Brian Damann ("Damann"), and Grant Oilar ("Oilar") are suing on behalf of themselves and all other similarly situated current or former tank makers employed by USA Tank Sales alleging it required them to work more than forty hours per week and willfully failed to pay them overtime compensation. USA Tank Sales denies the allegations.

Now before the Court is the parties' "Joint Motion for Approval of Joint Stipulation of Settlement and Release" (Doc. 28). The parties are seeking Court approval of a comprehensive proposed settlement ("the Settlement") consisting of (1) a collective-action "opt-in" settlement compromising the FLSA claims and (2) a Rule 23 "opt-out" class-action settlement compromising the Missouri MMWMHL claims. Because the existing record is insufficiently

developed for the Court to approve the Settlement and also contains several provisions which are problematic, the Court declines to approve the Settlement. The motion is DENIED.

## Background

The proposed Settlement was negotiated with the assistance of a mediator fairly early in this litigation, six months after Plaintiffs filed suit. The parties reached the Settlement after informally exchanging discovery but before engaging in any substantive motion practice.

The record concerning the issues in dispute in this lawsuit is not well developed. As best the Court can determine, the parties disagree over: (1) whether tank installers employed by Defendant during the relevant period were entitled to overtime for work performed internationally; (2) whether Defendant committed any wage and hour violations; (3) whether any violations were willful; and (4) the amount of any overtime Plaintiffs and the putative class members worked. Defendant argues that although it paid Plaintiffs a daily rate instead of an hourly rate, it paid Plaintiffs and the putative class members all the wages they were due. Defendant also contends it did not act in bad faith as demonstrated by the fact that it changed its pay practices in October 2012, before Plaintiffs filed their lawsuit.

## Standard

**1.    Standard governing court approval of FLSA collective actions.**

A valid settlement of an FLSA claim requires Department of Labor or court approval. *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1353 (11th Cir. 1982). To approve an FLSA settlement under 29 U.S.C. § 216(b), the Court must find that: (1) the litigation involves a bona fide wage and hour dispute; (2) the proposed settlement is fair and equitable to all parties concerned; and (3) the proposed settlement contains an award of reasonable attorneys' fees. *Hill*

*v. World Wide Tech. Holding Co, Inc.*, No. 4:11CV02108-AGF, 2012 WL 5285927, at *1 (E.D. Mo. Oct. 25, 2012).

To demonstrate the existence of a bona fide dispute, the parties should provide the district court with the following information:

> (1) a description of the nature of the dispute (for example, a disagreement over coverage, exemption or computation of hours worked or rate of pay); (2) a description of the employer's business and the type of work performed by the employees; (3) the employer's reasons for disputing the employees' right to a minimum wage or overtime; (4) the employees' justification for the disputed wages; and (5) if the parties dispute the computation of wages owed, each party's estimate of the number of hours worked and the applicable wage.

*Gambrell v. Weber Carpet, Inc.*, No. 10-2131-KHV, 2012 WL 162403, at *3 (D. Kan. Jan 19, 2012).

Furthermore, to determine whether an FLSA settlement is fair and equitable, courts consider many of the same factors used in evaluating a proposed Rule 23 class action settlement, including: (1) at what stage of the litigation the settlement was reached, and the complexity, expense, and likely duration of the remaining litigation; (2) how the settlement was negotiated, i.e., whether there are any indicia of collusion; (3) class counsel, the parties, and the class members' opinions about the settlement; and (4) whether the present value of the settlement outweighs the potential recovery after continued litigation. *See id.*; *Sanderson v. Unilever Supply Chain, Inc.*, No. 4:10-CV-0775-FJG, 2011 WL 5822413, at *2 (W.D. Mo. Nov. 16, 2011).

An FLSA settlement must also include a reasonable award of attorneys' fees and costs. The FLSA entitles a prevailing plaintiff to an award of fees and costs, and although the court has discretion in determining what a reasonable fee is, a fee award is mandatory. *Gambrell*, 2012

WL 162403, at *2. Where the defendant agrees not to object to a fee request, the court should examine the fee request with skepticism. *Sanderson*, 2011 WL 5822413, at *5.[1] This scrutiny mirrors that given a fee request in a Rule 23 class action settlement that is the product of "clear-sailing" agreement where the defendant agrees not to contest a fee request that falls below a certain threshold.

When the parties propose to settle a class of FLSA claims, the court must make a final class certification finding. *Gambrell*, 2012 WL 162403, at *2. In order for the court to make a final class certification ruling, the parties must make a record demonstrating all the plaintiffs are similarly situated.

**2.     Standard governing approval of Rule 23 class actions.**

Federal Rule of Civil Procedure 23(e)(1)(A) mandates judicial review of any "settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class." The court is responsible for ensuring that the settlement's terms are fair, adequate, and reasonable. Fairness requires a comparative analysis of the treatment of class members vis-à-vis each other and vis-à-vis similar individuals with claims who are not in the class. Reasonableness depends on an analysis of the class allegations and claims and the responsiveness of the settlement to those claims. Adequacy involves a comparison of the relief granted relative to what class

---

[1] As Judge Vratil observed,

> Such agreements deprive the court of a full record and benefits of the adversary process. They encourage plaintiffs' counsel to maintain inadequate contemporaneous time records and to submit fee requests on records which cannot withstand the adversary process. They promote a lackadaisical approach to fee litigation—regrettably forcing the Court to act as adversary to plaintiffs' counsel in examining fee applications. They can lead to unreasonable fee requests. To top it off, such stipulations have no apparent benefits to plaintiffs. The only beneficiaries are plaintiffs' counsel . . . who would insulate their fee requests from scrutiny through the adversary process.

*Bruner v. Sprint/United Mgmt. Co.*, No. 07-2164-KHV, 2009 WL 2058762, at *10 (D. Kan. July 14, 2009).

members might have obtained without using the class action process. Manual for Complex Litigation (4th) § 21.612, at 467-68.

In the Eighth Circuit, "the district court acts as a fiduciary, serving as a guardian of the rights of absent class members." *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932 (8th Cir. 2005). In determining whether a settlement is fair, adequate, and reasonable, a district court is required to consider four factors: (1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of expense of opposition to the settlement. *Id.* "The most important consideration in deciding whether a settlement is fair, reasonable, and adequate is 'the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.'" *Id.* at 933 (quoting *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1150 (8th Cir. 1999). Ultimately, the court must examine whether the interests of the class are better served by settlement than by further litigation. *In re Wireless*, 396 F.3d at 932. The settlement's proponents bear the burden of developing the record and proving that the settlement is fair, reasonable, and adequate. *See In re Pet Food Prod. Liab. Litig.*, 629 F.3d 333, 350-51 (3d Cir. 2010).

The parties must also demonstrate that class certification is appropriate under Rule 23. *Perez-Benites v. Candy Brand, LLC*, 267 F.R.D. 242, 246 (W.D. Ark. 2010). To do so, they must show that all of the requirements of Rule 23(a) and at least one of the requirements of Rule 23(b) are satisfied. Certification is appropriate under Rule 23(a) when "(1) the class is so numerous that joinder of all members is impracticable . . . (2) there are questions of law or fact common to the class . . . (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately

5

protect the interests of the class." Fed. R. Civ. P. 23(a). These requirements are typically summarized as numerosity, commonality, typicality, and adequacy. *In re Constar Int'l Inc. Sec. Litig.,* 585 F.3d 774, 780 (3d Cir. 2009).

Under Rule 23(b), a party seeking class certification must also show that,

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
>> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>>
>> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
>> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>>
>> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>>
>> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>>
>> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). In addition to these explicit requirements, Rule 23 implicitly requires that a class exist, that the proposed representative be a member of the class, and that the proposed class be "ascertainable or identifiable" and "administratively manageable." *Dumas v. Albers Med., Inc.,* No. 03-0640-CV-W-GAF, 2005 WL 2172030, at *5 n.7 (W.D. Mo. Sept. 7, 2005).

### Summary of the Proposed Settlement

The Settlement consists of two agreements, an FLSA collective action settlement and a Rule 23 settlement of the MMWMHL claims. Joint Stip. of Settlement and Release ("The Settlement"), Doc. 29-1, at ¶ 14(b)(ii). Both settlements define the class as,

> all individuals employed by USA Tank as tank makers, including installation field crews and insulation field crews, in the State of Missouri at any time from December 24, 2009, through May 23, 2013.

*Id.* at ¶ 3. The parties anticipate there will be 260 class members. *Id.* at ¶ 12.

Under the Settlement, Defendant will pay a maximum of $1,700,000.00, and all settlement money not claimed by class members will revert to Defendant. *Id.* at ¶ 14(c). Defendant will also act as the claims administrator and will be responsible for the administrative costs of the Settlement, but Plaintiffs' counsel "will have rights of oversight and involvement in the claims administration process." *Id.* at ¶ 14(g).

The Settlement gives class members three options: (1) join both settlements; (2) opt-out of both settlements; and (3) "do-nothing," that is, do not file an FLSA claim and do not opt-out of the class action settlement. *Id.* at ¶ 14; Claim Form, Doc. 29-1 Ex. B. The Settlement does not make any provision for a class member who would like to participate in the FLSA settlement, but choses to opt-out of the MMWMHL settlement.

The claims process is as follows. A claim form will be mailed to each class member notifying him or her of the minimum amount he or she can receive and providing three choices:

1. Join both settlements, that is, opt-in to the FLSA settlement and make a claim in the class action settlement. To choose this option, a class member checks a box marked "Option No. 1," checks three other boxes, and then signs the form. The first two boxes require the class member to acknowledge the settlement payment and waive his right to sue. The third checkbox is a detailed confidentiality provision that forbids the class member from disclosing the settlement in any way and provides for attorneys' fees to enforce the provision. To opt-in to the FLSA portion of the settlement and make a claim for the full value of the MMWMHL settlement, the class member must check all three boxes.

2. Opt out of both the FLSA settlement and the MMWMHL settlement. To choose this option, a class member checks a box marked "Option 2" and signs the form.

3. Do nothing. If a class member does nothing, he or she is automatically not included in the FLSA portion of the settlement (because it is by law an "opt-in" collective action), and is automatically included in the MMWL settlement but receives a lesser settlement amount, $200.

The claims process does not provide class members with a fourth option of participating in the FLSA settlement and opting out of the MMWL settlement.

Settlement payments and enhancement payments will be mailed within thirty days of the effective date. *Id.* at ¶ 14(e), (h). Attorneys' fees and costs, however, shall be paid to class counsel within thirty days of the effective date. *Id.* at ¶ 14(f).

Defendants will pay $1,133,333.33 under the FLSA portion of the Settlement. *Id.* at ¶ 14(c). Plaintiffs' counsel will receive one-third of this amount ($377,777.78), *id.*, and by operation of a "clear sailing" agreement,[2] Defendant agrees not to object or to oppose this award. *Id.* at ¶ 14(f). Additionally, subject to Court approval, Plaintiff Stewart will receive

---

[2] Under a clear sailing agreement "the defendant agrees not to contest the amount awarded by the court presiding over the settlement as long as the award falls beneath a negotiated ceiling." William D. Henderson, Clear Sailing Agreements: A Special Form of Collusion in Class Action Settlements, 77 TUL. L. REV. 813, 814 (2003).

$25,500 and three other Plaintiffs—Damann, Oilar, and Michael Hagerman[3]—will receive $17,000 each as class representative "enhancement" awards. The "enhancement" awards are in addition to the amount each representative will receive in the settlements as class members. *Id.* at ¶ 14(e).

It is unclear whether or how the remaining $679,055.55 in FLSA settlement funds will be distributed. The Settlement states that,

> The amount allocated to each Class Member shall be determined pursuant to an equitable formula based primarily upon: (1) the amount of compensation earned and the total number of weeks worked for Defendant during the Class Period; and (2) status as Representative Plaintiff as of the date of the approval of the Settlement. The formula shall be subject to the approval of Plaintiffs and Defendant, which approval shall not be unreasonably withheld.

*Id.* at ¶ 14(c).

The MMWMHL portion of the Settlement provides $566,666.67. *Id.* at ¶ 14(c). Plaintiffs' counsel will receive one-third of this amount ($188,888.87), and this payment is also subject to the "clear-sailing" agreement. *Id.* at ¶ 14(f). This leaves $377,778 available to pay the class members' MMWMHL claims. A class member who chooses not to participate in the FLSA settlement will receive a reduced share, $200, for his MMWMHL claim. *Id.* The Settlement does not explain how much more a class member will receive for his or her MMWMHL claim if he or she participates in the FLSA settlement.

## Discussion

In reviewing the Settlement, the Court is mindful that public policy favors settlements and that in reviewing a proposed class action settlement a court must not substitute "its own

---

[3] Although a "consent to join" form has not been filed for Hagerman, the Court assumes a "consent to join" form is forthcoming and he will join the litigation as a plaintiff.

judgment as to optimal settlement terms for the judgments of the litigants and their counsel."[4] *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148-49 (8th Cir. 1999) (rejecting the objectors appeal of the district court's order approving class counsel's proposed settlement). At the same time, review of a proposed class action settlement "must be exacting and thorough" because the adversarial nature of such litigation is often lost once the named plaintiff and the defendants decide to settle, and "the settling parties frequently make a joint presentation of the benefits of the settlement without significant information about any drawbacks." Annotated Manual for Complex Litigation (Fourth) § 21.61 (2008).

The Court commends the parties for their efforts to reach an amicable resolution to this dispute, but the Court cannot approve the Settlement. As a threshold matter, the Court lacks the necessary information to approve the Settlement. With respect to the FLSA portion of the settlement, the Court cannot determine exactly what the legal issues in dispute are and certify that this litigation involves a bona fide wage and hour dispute. Additionally, because the record is silent as to the value of the class members' FLSA claims, the value of the FLSA settlement, and the amount of assistance the class representatives have provided, the Court cannot determine whether the FLSA portion of the Settlement is fair and equitable to all parties concerned. The record is similarly underdeveloped with respect to the value of the class members' MMWMHL claims and the value of the MMWMHL settlement. For example, because the record is devoid of information concerning how much an individual class member will receive for his or her claim, the Court cannot determine whether the MMWMHL settlement is fair, reasonable, and adequate.

---

[4] Of course, the deference given to counsel's judgment about the Settlement is reduced since at this stage of the litigation the Court has not certified any class, found that Plaintiffs' counsel is qualified to represent any certified class, or found that the Named Plaintiffs will fairly and adequately protect the interests of any class and should serve as class representatives.

Finally, the Court has specific concerns about several Settlement provisions, which are discussed below, as well as the combined effect of these provisions.

**1.      The reversion provision is problematic.**

First, the Settlement contains a reversion provision under which all settlement money not claimed by class members will revert to Defendant. Some courts have objected to such provisions in claims-made settlements because they can be used as a collusive vehicle resulting in significant fees for class counsel, a low payout by defendants, and limited benefits to the class. Michael J. Puma & Justin S. Brooks, Navigating Developing Challenges in Approval of Class and Collective Action Settlements, 28 A.B.A. J. LAB. & EMP. L. 325, 329 (2013). Even if unintentional, these effects are the byproduct of reversionary claims-made settlements. *Id.* In such settlements, attorneys' fees are based on a "common fund" or "percentage-of-the-recovery" approach in which plaintiffs' counsel receives a percentage, typically thirty-three percent, of the maximum settlement amount. *Id.* "At the same time, defendants' actual payout to class members is a function of participation rates. Thus, if participation is low, defendants" will receive a large reversion, significantly reducing their total payout, while the plaintiffs' attorneys still receives their full fees based on the maximum settlement amount. *Id.* Accordingly, some courts view reversionary provisions in claims made settlements as a red flag of potential collusion, particularly where—as here—the settlement contains a "clear sailing" agreement on attorneys' fees. *See, e.g., In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011).

Here reversion of the unclaimed portion of the FLSA settlement funds is not particularly objectionable because the Settlement will only extinguish the FLSA claims of class members' who have opted in to the Settlement. Thus, there is a reasonable argument that any unclaimed

money from the FLSA settlement should revert to Defendant to pay for any future FLSA claims brought by class members who choose not to opt in.  Of course, there is still a problem of basing the attorneys' fees award on the maximum FLSA settlement amount regardless of how much is actually paid out to the class, because this inflates the attorney fee award.

Reversion of the unclaimed MMWMHL settlement funds is still problematic though for the reasons discussed above—it risks lowering Defendant's payout, increasing class counsel's fees, and limiting benefits to the class.  Additionally, since the Settlement does not explain precisely how the MMWMHL settlement funds will be dispersed, the Court cannot determine the amount of MMWMHL settlement funds that are likely to revert to Defendant.

### 2. The Settlement denies class members who wish to participate in the FLSA settlement an opportunity to opt-out of the MMWMHL settlement.

The Court sees no reason why a class member's MMWMHL claim value should be based on his or her participation in the FLSA settlement.  As the Settlement is currently structured, in order to receive a full share of the MMWMHL settlement, a class member must also opt in to the FLSA settlement.  If a class member decides to pursue his FLSA claim separately and not opt in to the FLSA settlement, then he cannot receive a full share of the MMWMHL settlement.  This discourages a class member who would like to participate in the MMWMHL settlement from separately pursuing his or her FLSA claim, and it also lowers the number of class members who will receive full value for their MMWMHL claims.

### 3. The claim provision for the MMWMHL settlement is unnecessary.

Related to the above, the Court questions whether the MMWMHL settlement need be a "claims-made" settlement at all.  Since the class members are all current or recent employees of USA Tank Sales, Defendant will have a name, recent address, and social security number for each class member.  With this information, a settlement check can be mailed directly to each

Rule 23 class member, which will ensure maximum participation in the settlement. *See, e.g., Holling-Fry v. Coventry Health Care of Kansas, Inc.*, No. 4:07-0092-cv-DGK, 2012 WL 860395, at * 1-2 (W.D. Mo. March 13, 2012) (approving revised settlement that mailed settlement check directly to individual class members, ensuring that 87% of class members would participate in the recovery as opposed to 6% in the initial settlement).

The purpose of the claims-made provision appears to be to encourage class members to agree to the confidentiality provision forbidding them from disclosing the Settlement. This is problematic since FLSA settlements, like any judicially approved settlement, are presumptively open to the public. *Jessup v. Luther*, 277 F.3d 926, 928-930 (7th Cir. 2002) (Posner, J.); *In re Sepracor Inc. FLSA Litigation*, MDL No. 2039-DGC, 2009 WL 3253947, at *1-2 (D. Ariz. Oct. 8, 2009) (unsealing FLSA settlement agreement, noting strong presumption for keeping FLSA settlement agreements unsealed and available for public view); *Stalnaker v. Novar Corp.*, 293 F. Supp. 2d 1260, 1263 (M.D. Ala. 2003) (noting the presumption in favor of openness is strongest when the document at issue is an FLSA wage-settlement agreement). The effect of confidentiality provisions such as this one is that the plaintiff, plaintiff's attorney, and the employer all benefit from the settlement while the plaintiff's co-employees remain ignorant of the potential violation of their rights because of the confidentiality provision. *Picerni v. Bilingual Seit & Preschool Inc.*, 925 F. Supp. 2d 368, 375 (E.D.N.Y. 2013). This runs contrary to the intent of Congress in enacting the FLSA, which was to protect workers from substandard wages and oppressive working hours. *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1353 (11th Cir. 1982). Of course, this problem is somewhat ameliorated here since all tank makers during the relevant period will be notified of the Settlement and have the option of

settling their claims, but there may be other employees of USA Tank Sales who work or are paid similarly to tank makers who will remain uninformed of any potential wage and hour violations.

**4.      The proposed enhancement payments are not justified by the existing record.**

The Court is also concerned that the enhancement payments to the class representatives are disproportionate to the amount of money that the class members will receive and will overcompensate the class representatives for their efforts in this case.  In the Court's experience, class representatives typically receive enhancement payments between $500 and $10,000, depending on the work performed in the case and how much each individual class member ultimately benefits from the settlement.  Here the parties propose enhancement payments of $17,000 and $25,000.  If Defendant pays the maximum amount in claims, the average class member will receive about $4,065.[5]  Thus, the enhancement payments would be four to six times the amount the average class member would receive.  Given that the record does not indicate the class representatives have performed any unusual service on behalf of the class, and that the enhancement payments take away from the pool of funds that would otherwise be available to pay class members' claims, the proposed payments are excessive.

**5.      The payment schedule for attorneys' fees is problematic.**

The Court is also concerned about the terms of the attorney fee award.  Under the Settlement, Plaintiffs' counsel is guaranteed to receive an award of $566,667, regardless of how many class claims are paid or how much the individual class members receive.  While an attorney fee award equal to 1/3 of the money actually recovered by the class is reasonable, there is no guarantee the class will actually recover anywhere near $1,000,000 in the Settlement.

---

[5] The calculation is as follows:  $679,055 (FLSA settlement funds distributed to class) plus $377,778 (MMWMHL settlement funds distributed to class) equals $1,056,833.  Divided by 260 class members, this equals $4,064.74.

Depending on the claims rate, class counsel might recover the same as, if not more than, the entire class.

Furthermore, because the Settlement requires class counsel to be *paid* within thirty days of the effective date while the settlement checks need only be *mailed* within thirty days of the effective date, the Court cannot determine the amount of money the class will receive before ruling on the amount of attorneys' fees to award. To avoid this problem, the Court typically reserves the right to postpone or withhold its ruling on any motion for attorneys' fees until such time as it can determine the total amount actually received by the class.

The Court is also reluctant to approve any settlement which allows counsel to receive 100% of their fees before the settlement process is completed. Holding back a percentage of the attorney fee award until all class members have received their settlement checks gives class counsel a financial incentive to monitor the settlement process and quickly respond to any client concerns. *Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F. Supp. 375, 380 (D. Mass. 1997) (noting that withholding a portion of attorneys' fees until the end of the claims process reinforces class counsels' incentive to monitor the process vigorously).

**6.     The "clear sailing" provision on attorneys' fees is cause for concern.**

While common in class action settlements, a "clear sailing" provision is cause for concern since it is "prima facie evidence of simultaneous negotiations of merit relief and fees, which is a practice fraught with serious ethical concerns . . . because plaintiff's counsel may be accepting a lower settlement for the class in exchange for a generous and nonadversarial treatment of fees." William D. Henderson, Clear Sailing Agreements: A Special Form of Collusion in Class Action Settlements, 77 TUL. L. REV. 813, 814 (2003). A "clear sailing" agreement ensures that there is no adverse party to bring to the court's attention any defects in

15

class counsel's request for attorneys' fees. Thus, where the attorneys' fees provision in the settlement contains a "clear sailing" clause, some courts apply heightened scrutiny to the request. *Stokes v. Saga Intern. Holidays, Ltd.*, 376 F. Supp. 2d 86, 89 (D. Mass. 2005)

**7.     Allowing Defendant to serve as the claims administrator is a conflict of interest.**

The Settlement provides that Defendant will act as the claims administrator. Because the reversion clause provides that any remaining funds will be returned to Defendant, Defendant will have a financial incentive to deny class members' claims, which is a patent conflict of interest. Granted, allowing Defendant to serve as the claims administrator would lower the cost of administering the Settlement, theoretically allowing Defendant to pay more for individual class members' claims, but it is still a conflict of interest. Since there are only 260 class members and their names, addresses, and social security numbers are already known, hiring a third-party to ensure impartial administration of the Settlement will not be cost-prohibitive because the class members will be easy to locate and there will be relatively few, only 260, claims to process. Consequently, the Court finds that hiring an independent third-party administrator is a small, but necessary, price to pay to ensure impartial administration of this $1.7 million settlement.

**8.     The combination of the above provisions weighs against granting approval.**

Finally, while the Settlement contains several provisions which are individually problematic—the reversion, the large enhancement awards, the "clear sailing" agreement on attorneys' fees, and the provision allowing Defendant to act as the claims administrator—their collective presence is a red-flag for potential collusion which weighs against granting approval.

## Conclusion

Accordingly, for the reasons discussed above, the parties' "Joint Motion for Approval of Joint Stipulation of Settlement and Release" (Doc. 28) is DENIED. The Court encourages the parties to confer on an alternate settlement proposal that addresses the Court's concerns. Should the parties reach a revised settlement, the Court will promptly consider it. In the meantime, the parties should proceed with discovery. If a revised scheduling order is needed, the parties should submit a joint proposed revised scheduling order to the Court on or before March 25, 2014.

**IT IS SO ORDERED.**

Date: March 4, 2014

_____
GREG KAYS, CHIEF JUDGE
UNITED STATES DISTRICT COURT